The Court will now call Appeal 25-2827, Estate of Jason Thomson v. Thomas Behn et al. Argument on behalf of the Appellant, Mr. Rosch, will begin with you. Thank you, Your Honor, and may it please the Court. I'm Attorney Kevin Rosch, and I represent the Plaintiff Appellant, the Estate of Jason Thomson. In dismissing the Estate's Fourth Amendment failure to provide medical care claims, the District Court ignored clear disputes of material fact, provided improper inferences to the moving party, and misapplied clear Seventh Circuit case law. What is that case law? So, this case has been briefed extensively in this matter. Primarily, we're looking at Ortiz v. Chicago, which establishes a Fourth Amendment right for medical care in the Seventh Circuit since 2010, and then we are also looking at Estate of Perry v. Wenzel. Estate of Perry v. Wenzel is particularly on point. We have in Perry a seizure patient who was arrested and made complaints about not being able to breathe. In turn, those officers in Perry responded, if you're able to talk, you're able to breathe. That is exactly what Defendant Wainish did here with Mr. Thomson. What should the officers have done? What should the officers have done is very simple here. Start at the time of the arrest. Absolutely. So, at the time of the arrest, we're at St. Vincent Hospital. Mr. Thomson is a seizure patient. The police officers have been called, and Mr. Thomson is arrested over the course of about 10 minutes, and he's making these complaints. What the officers should have done when they hear these complaints and when they see the physical distress that they testified to is that they should have gotten Mr. Thomson a medical evaluation by a medical professional. That is what this Seventh Circuit has stated allows them to rely on because these officers— But is that only because they were at St. Vincent? What if they were in his front yard? If they were in his front yard and they understood that he was making these complaints about not being able to breathe, stating that he was going to die, stating that he needed help along with the combined physical symptoms, they needed to either take him to a hospital for medical clearance to see if he would be clear to transport to the county jail, or they could call EMS. That wouldn't have done him any good, though, because when they transferred him to the jail, they had a nurse look at him. For me, he was better off going to the jail than he would have been to the hospital. I realize it's a tragic ending here. So just to be clear, you're talking about a hypothetical on the front yard? Yeah. Okay. I mean, the problem for the officers is this happens a lot, right? I can't breathe, I'm in distress, take the handcuffs off. It seems to me like what you're suggesting is when that happens, they should take the handcuffs off, transport them to hospital for medical evaluation. So that is exactly what the court stated in Perry. So this was an argument that the defendants put forward. They stated that it's reasonable for the officers to take Mr. Perry to the county jail because they understood that a jail nurse would see him there. However, the Seventh Circuit stated that that was not appropriate determination at summary judgment. It was a material dispute of fact that should not have been determined at summary judgment. Maybe a jury would find that reasonable. Maybe, in this case, a jury would find it reasonable that the officers took Mr. Thompson, who was complaining about these serious health issues, out of the safest place possible and brought him to a county jail where we have Nurse Warren, who testified herself that she was not equipped to provide the medical care that Mr. Thompson needed and that he needed to go back to a hospital. What do we make of the form that the doctor signed at the hospital saying that there were no emergency conditions? Absolutely. So there's multiple issues with this clearance form that was signed allegedly by Dr. Gerwing. Is there any doubt that it was signed by him? I don't particularly, but Sergeant Bain, who procured this form, provided it to a nurse who then apparently provided it to Dr. Gerwing where it was signed. Sergeant Bain testified that he did not see this form signed. He did not discuss this issue with the doctor or with the nurse about Mr. Thompson's serious medical complaints. So we have an issue right now with the clearance form time that is apparently happening. If we go back and look at the video time stamp, it's while Mr. Thompson is still being placed in the WRAP restraint. But not only that, this medical clearance form was rejected by the county officers at the jail. They looked at this form and they said, we have concerns that this form does not clear Mr. Thompson for whatever. But that's, I mean, I think the difficulty with that is that those are medical assessments, and we're talking about officers, right? And officers, absent some exigent circumstances, are allowed to rely upon the opinions of medical professionals. And so here, perhaps the doctor was wrong. Perhaps the doctor should have done a more thorough evaluation of Mr. Thompson before he signed the clearance form. But as far as what the officers would know is that this clearance form was signed. And so why isn't it in their mind that seemed, why isn't that a reasonable inference? Absolutely, because of the officer's own testimony. Every single one of the seven defendant officers testified that they did not see any medical care provided by any of the providers at the hospital to Mr. Thompson. This is a material fact of this case. The video shows that no care was provided to Mr. Thompson the entire time he was in the defendant's custody. So Mr. Thompson did not receive a medical evaluation. That needs to be clear. And what Sergeant Bain testified to is that he understood that what this form meant was that Mr. Thompson didn't have any other issues related to his seizures. So the defendants are all crystal clear. The video evidence is crystal clear that Mr. Thompson, the entire time he was in the defendant's custody at St. Vincent Hospital, never received any medical care. And the defendants... So I take it you're not, so if there's a hypothetical, let me give you a hypothetical. Let's say the police are called to detain someone at a hospital. They go there, they get the form, it says no medical condition, they detain the person, and then they take them to the jail. Under those circumstances, you would agree that it would be very difficult for a reasonable jury to find that there was any sort of violation there. If there is an actual medical evaluation that occurs... No, no, just say that it's the same form. But the police... Do you expect the officers to then stop and go to the doctor and say, hey, look, can you do another evaluation? I'm not really quite sure what exactly you're requiring them to do.  So part of why the defendants needed to follow their own policies, because their own policies state this. It's policy 300, the use of force, which requires persons who require protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. So the defendants, they understood that this is a prolonged arrest. They understood that it took multiple officers. They understood every one of them testified that they were trained in this policy. They understood that their policies needed to be followed and that they were there the entire time and they did not witness any medical care being provided by any of the medical providers there. So I guess in your hypothetical, we just have a different set of facts here. And if they don't know, then I suppose it's possible that they could rely on that information. But here the defendants absolutely 100% knew that Mr. Thompson did not receive any medical evaluation while he was in their custody and care. So I take it what you're saying is that once he was put in the WRAP and Mr. Thompson started to say that he couldn't breathe, that at that point it was incumbent upon the officers to flag down a nurse or a doctor and say, hey, look, can you evaluate him again? Absolutely. So there was no real first evaluation. Mr. Thompson was a patient in that hospital for seizures. He received treatment and then while he was in the process of being discharged, that's when the police were called. So for Mr. Thompson's serious medical complaints about not being able to breathe, about stating that he was going to die, about stating that he needed help, Mr. Thompson is in their custody. He cannot walk out of that WRAP and obtain it himself. It is the defendant's constitutional duty to provide that to him. In jumping off on this, the Seventh Circuit in Royal v. Norris and the district court used this to apply qualified immunity in this case. In Royal v. Norris, we had an arrestee who the officers witnessed him spit out some white substance they believed to be crack cocaine. The officers questioned that individual on this. They asked him, what were you chewing on? He denied what he was chewing on. He said he didn't need any medical care. Yet those officers reached out. They got a medical provider to come to the site and provide an actual evaluation of him. That medical provider stated that he did not need to go to a hospital and that he was clear to go to the jail. So that is what is missing here. We are missing that evaluation, that medical evaluation for the defendants to rely on. That is completely absent here. Without that, they are not entitled to qualified immunity. Without that, they are not acting as objectively reasonable officers. That is the key distinction here between every single case cited by the defendants. It is the key distinction between every single case cited by the district court in its opinion as well. Additionally, in combination with, well, I guess I'll jump back to... If we could break down the situation into what took place at the hospital, what took place during transport, and what took place at the jail. When they get to the jail, the nurse arrives. They see the nurse. Why can't they rely upon the nurse at that point? There are a few reasons. First, just as this court held in Perry, they found that the officers there did not tell the county officials about the serious medical concerns that they had witnessed during their arrest and while they were on transport. The same exact thing happened here. So at the jail, we have three officers. We have Pineda, we have Harvath, who were the transporting officers, and we have Vable, who came separately. Every one of those officers failed to disclose that Mr. Thompson was making serious complaints about not being able to breathe, stating he was going to die, and that he needed help. Not one of them stated that. They are not entitled to rely on incomplete information, and the nurse herself stated that she was not equipped to handle Mr. Thompson and stated that he needed to go back to a hospital. So here we have the defendants who are withholding information from a medical professional and saying, well, we should be able to rely on this judgment even though we are actively obscuring what exactly happened. And by the time Mr. Thompson was at the hospital, he could barely say words. He was not able to advocate for himself, and that is a key distinction that is emphasized in Perry again. It is a dispute of fact that needs to be put to a jury. Would you like to reserve the remainder of your time? Yes, Your Honor. Thank you, Mr. Roche. Ms. Baynard, we'll move to you now for argument on behalf of the appellee. May it please the court, Your Honors. Jasmine Baynard on behalf of the appellees, the city of Green Bay, and seven Green Bay police officers who interacted with Jason Thomas on the early morning hours of February 10th for 45 minutes between 2.43 a.m. and 3.30 a.m. Now, one thing my friends and I on the other side of the case agree with is that Mr. Thompson's death was tragic. However, the Fourth Amendment does not impose liability simply because an encounter ended tragically. It imposes liability if the officers acted objectively unreasonable under the circumstances that they faced. And this court is well aware that that standard is not negligence. It's not gross negligence. And we do not hold officers to the same standard as we would a medical professional. Moreover, the Fourth Amendment evaluation cannot be contemplated or conducted with the benefit of 20-20 hindsight. When we are doing that evaluation, we need to look at the circumstances that the officers faced and how they responded to those circumstances. Ms. Baynard, a question concerning the cause of death. There seems to be some dispute whether it was a seizure or a heart attack. I think there is a forensic document that he died of a heart attack. What is your understanding as to the cause of death? So, for the purpose of summary judgment, I guess with regard to it being a disputed fact, my understanding of the cause of death is that it was cardiac arrest and that the way that the medical examiner described it was that he started to have – he released endorphins, his body went into kind of a fight or flight, and that once you kind of get on that track, it's hard to take a step back. So the medical examiner also discussed his seizure disorder, sudden unexpected death from seizure disorder, and then talked about some other medical conditions like his bad heart. So that is – for the purpose of summary judgment, I think that there could possibly be a disputed fact on what the cause of death is, and that's why our focus is more let's look at the liability aspects. But I do think – I don't think the case should go back to trial, but if it did, I believe that the testimony from the medical examiner would support that a different arrestee in the same situation likely would not have passed away from being placed in that RAP device to be transported to the jail. Ms. Boehner, one of the things that – one of the facts that kind of concerned me was that the RAP and the instructions surrounding the RAP, right, my understanding is that the RAP manual that the officers are trained on states that if a person in the RAP complains about breathing, then they should be immediately released from the RAP and that medical attention may be necessary, right? Here, for whatever reason, the officers didn't follow those particular procedures. And I was wondering if you can address that fact and the relevance of that fact to the appeal that's before us. Of course. So with regards to any police policy training initiative, one, as the court will know, is that it's not basis for a constitutional violation. However, all of those policies have to be complied with in the sense that the officers are facing at the moment. So when Mr. Thompson complained, and this is during the transport, again, that he made his comment that he could not breathe, what the officer did was providing an assessment, looking back, making sure that he was talking, that he was breathing. And I think Justice Kirsch pointed this out with the pellants, but the court made – the district court in kind of discussing this said, while it's true that officers can be placed on notice of a serious medical need by the report of an arrestee, they're not always required to take that kind of at and accept as true whatever they say. I represent a lot of cops. Right, but I understand what you're saying. But the RAP instructions or the policies surrounding the RAP doesn't say, when a person in the RAP complains about breathing, talk to him and see if he's able to talk. And if he is, don't worry about it. It says pretty forcefully, if someone's complaining about not being able to breathe, then release them from the RAP and you may have to seek medical attention. So to that point, I will say that when Mr. Thompson is being transported, there are other factors that go into him not being immediately released. The officer said they were driving. It's February, so we're just on a highway. They believed that Mr. Thompson was kind of trying to negotiate with them to get out of the RAP. So while I agree with you that the policy indicates, you know, under the precaution sections of things that you should do, all of those policies, I believe, while they can be complied with, I don't think that there is really bright-line rules. I think that the officers have to think about officer safety. He had just fought with officers. He's being transported to a facility where he's going to see a nurse. And so that is the reasoning for why they either deviated from policy or, I guess, complied with it to what they believed was an appropriate response. How do you respond to Mr. Rauch's argument that even though they got the emergency form that dealt with kind of why Mr. Thompson was in the hospital anyway, that once he was in the RAP at the hospital and complained about not being able to breathe, that at that point, they should have flagged down a nurse or some sort of medical professional and asked them for some sort of evaluation? So this kind of touches on this idea that the officers weren't entitled to rely on the medical evaluation form just in general. So I disagree that they were required while they are placing Mr. Thompson in the RAP to get an additional medical clearance. What the officers get the medical clearance form, and it's in the record at 66-2, that medical clearance form is on St. Mary's letterhead. It is a form that the officers get, and it's to clear them, to remove them from the hospital, to take them to the jail. Now, that medical clearance form indicated that Mr. Thompson was seen at the hospital for a seizure, and it also indicated that he had this, he fought with officers. The Brown County jail staff received it. Nurse Warren received the notice. So the idea that while Mr. Thompson, before this gets signed, to take him out of the emergency room, that the officers were required to do more, I think places a burden on them that is not necessarily reasonable. With Mr. Thompson as well, when he makes this complaint that when he says, I can't breathe, and that's while they're placing him in the RAP, the officers check, and they confirm that he is breathing. He's talking. He's fighting with them. And this takes place, this entire interaction, and you can see from the surveillance video, taking place within 10 feet of the nurses that treated him, the doctor that treated him, and they're in a hospital situation. I believe the hypothetical that you provided to the appellees was, what if this arrest would have happened if it would have happened on his front lawn? Then I believe that the officers would have then taken him to the hospital. This form would have still gotten filled out. It might have been a longer kind of evaluation, right, if he made those complaints, had a seizure, and they took him there. But there's no case law that I've seen. I think the appellant's interpretation of what Perry requires is different than my understanding of what Perry requires. But at the time, he said he could not breathe before being placed in the RAP. He was evaluated to make sure he was breathing. They felt his chest. They made sure his airways weren't obstructed. The officers were in the presence of medical staff. In fact, Dr. Gerwing's statement to the DCI says, I hear him say, I can't breathe. And then he complies. So I'm not sure that when we're talking about the reasonableness in context of the whole encounter, that there's anything that would have required the officers to get a second medical evaluation. And I think we can contrast that with Perry and some of the distinctions the court made there was you got this medical clearance form. However, the officers' observations of Perry were so contradictory to the medical examiner's form, or the medical release form. There, they got this medical form signed off on. However, the officers with Perry in the hospital observed him have two seizures. After each seizure, they noted his condition worsened. Not only did his condition worsen, one of the officers called the supervisor and said, hey, he's doing really bad. We are so concerned about his condition. Do you think we should take him to the processing center where there's no jail nurse? Or do we take him to the county jail where there is a jail nurse? And the record in Perry was that the lieutenant said, we need to get his paper done, take him back to the processing center where there is no nurse, and I don't care if you have to drag him out of there. That's the condition. And they did have to drag him out of there. He couldn't walk on his own. That's the condition that Mr. Perry was in in front of the officers when they removed him from the hospital. The condition of Mr. Thompson is very different. None of the officers observed him to have a seizure until the last very few minutes of the interaction. And even at that time, if you've ever seen somebody have a seizure, it's not what we expect to see on TV. It's a very small movement, and Nurse Warren indicated it looks like he's having a seizure. They pull him out, they do the CPR, and unfortunately they're unable to serve to revive Mr. Thompson. And so I think really the kind of distinction here between and the estate relies heavily on Perry. So while I think the substantive law and what the officers did here was objectively reasonable under the circumstances, under the information they had, qualified immunity also serves as an additional and even stronger basis to affirm the district court. And if we're looking at Perry, which, again, this court said failure to do anything, failure to take any action in the face of a medical condition is objectively unreasonable. And I agree. I listened to the oral argument. I agree with the court's ruling. I agree with the questions I was asked during the oral argument. And the plaintiff's brief considers some of these factual distinctions. So when we're talking about the second prong of qualified immunity, in their brief they call these distinctions immaterial. They basically say the argument that Perry merely took longer to die is a wild oversimplification of the distinctions between these two cases. And time is material because Perry was in the custody of officers for 20 hours, 20 hours in which he had three seizures, his condition worsened, he was left unattended in clothes that he had urinated in, defecated in, he could not walk, and the last two hours of his life he was in a spit mask that was covered in blood. This all occurred before a medical emergency was called, whereas Mr. Thompson is in custody of the officer for 45 minutes, less than. He's constantly monitored. The observations the officers make is he's combative, he has the ability to fight with them. Is he breathing heavier at some point? Yeah. The officers are also breathing heavier. Is he sweaty? Yes. The officers testified that they were also exhausted from having to fight with Mr. Thompson to get him into custody. Based on Mr. Thompson's outward condition, it wasn't unreasonable for the officers to perceive that, like a lot of people at 3 o'clock in the morning that fought with officers, he realizes when he's in the wrap that he's calming down, he realizes he's getting taken to jail, there's usually not a reason to kind of continue to fight. And that's what they observed. And when they noticed that there was a medical emergency, they immediately did CPR, called 911. And Perry, the nurse called a medical emergency at 848. This is 20 hours after he had been in their custody, and then left him on the floor to die. Left him on the floor. The security video shows him going back and forth, and then slowly stopped moving. The nurse never touched him. When she finally touched him and lifted up the spit mask, he was soaked in blood and he was already dead. Ms. Boehner, can I ask you about the helmet that they put on him, the wrap? Yes. And, you know, when he's placed in the car to be transported, it kind of gets displaced, and so it appears that it's put on backwards or is moved kind of backwards. What is your understanding about what happened there? So during the course of this case, I've actually been placed in the wrap and put the helmet on. It is not ergonomic at all. It's huge. It's like a one-size-fits-all. It kind of reminds me of those, if you've ever done like the play Joustine with like the big foam things. So it's perforated. And the purpose of the helmet is to keep people from hitting their own heads on the ground. And so when it's placed on his head, it's turned. I think in the video you see at some point he even gets it off of his head. So I think that's just kind of the makeup of the mask. The officers have also said it's not super ergonomic. It's hard to keep it on people's head. But they didn't want to, when they put it on, pull the strap all the way because, again, I mean, they're just trying to keep it on his head somehow. So while looking back, I know the court pointed out that, hey, I wish the officer would have turned it so it wasn't covering. I don't think that it really played a part in the kind of role of the sequence of events because it was perforated, you know. Thank you very much, Ms. Bannard. Thank you. We'll now move back to you, Mr. Roche, for a rebuttal argument. Thank you, Your Honor. A few clarifications that need to be made. Causation in this matter is not under dispute. The medical examiner found that Mr. Thompson died of a heart attack that was caused in part by the defendant's actions, their use of restraint, and that is confirmed by the only other witness, expert witness, qualified to testify on medical matters, and that's the plaintiff's retained expert, Dr. Kenneth Stein, which the district court cited in finding that the causation element has been met. There is no issue of this phantom seizure, and there is no medical evidence in the record that states that that was his cause of death. Secondly, I was an attorney on the case in Perry. The 20-hour issue is just inaccurate. So when we're looking at the actions of the city officials in Perry, Mr. Perry suffered a seizure in their custody. They brought him to a hospital. Once he was in the hospital, he was released, and that started a two-hour period of time when the defendants had him in their custody and heard his complaints about not being able to breathe. So this whole 20 hours is not accurate. It was a two-hour period time frame, much similar to the time frame that we have here. Now, Attorney Baynard stated that Dr. Groen heard Mr. Thompson in some statement to the investigators, but she declined to state that he stated he could not see everything that was going on. Again, that is the issue here. These are inferences that the district court is providing to the moving party about what these medical professionals could see, what they could not see, when seven officers are surrounding an arrestee. We have no facts in the record. We have no testimony from these medical professionals, and providing these inferences is improper. It is reversible error, and we ask the court to reverse. Thank you very much, Mr. Roche. Thank you, Ms. Baynard. The case will be taken under advisement.